**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| NATIXIS FINANCIAL PRODUCTS, LLC, | : | |
| | : | |
| Plaintiff, | : | **OPINION** |
| | : | |
| v. | : | No. 2:13-cv-07076 (WHW) |
| | : | |
| PUBLIC SERVICE ELECTRIC AND GAS | : | |
| COMPANY, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |
| | : | |

**Walls, Senior District Judge**

　　Defendant Public Service Electric and Gas Company ("PSE&G") moves to dismiss Plaintiff Natixis Financial Products, LLC's ("Natixis") complaint pursuant to either Federal Rule of Civil Procedure 12(b)(6) or 12(b)(1). However, the substance of the motion is actually a request to refer the matter to the New Jersey Board of Public Utilities ("NJBPU") under the doctrine of primary jurisdiction. The Court will construe PSE&G's motion as such. Natixis opposes PSE&G's request. Under Federal Rule of Civil Procedure 78(b), this motion is decided without oral argument. PSE&G's request to refer the matter to the NJBPU under the doctrine of primary jurisdiction is granted.

## FACTUAL AND PROCEDURAL BACKGROUND

　　On October 9, 1991, the New Jersey Board of Regulatory Commissioners ("NJBRC"), the predecessor agency to the NJBPU, adopted Demand Side Management ("DSM") Resource Plan

**NOT FOR PUBLICATION**

regulations which were codified at N.J.A.C. 14:12-1.1, *et seq.* (23 N.J.R. 3380). The NJBPU's purpose in adopting these regulations was "to foster the increased penetration and end use of energy efficiency technologies applicable to the use and supply of electric and gas energy in the State." *Id.* (quoting 23 N.J.R. 3380).

In accordance with those regulations, PSE&G filed a proposed DSM Resource Plan with the NJBPU on February 7, 1992. *Id.* PSE&G's plan included proposed electric and gas Core and Standard Offer DSM Programs, budgets, cost recovery mechanisms, avoided costs, gas and electric Standard Energy Savings Agreements ("SESA"), Measurement and Verification Protocols, block size, and other information as required by the NJBPU's regulations. *See* Quraishi Cert., Ex. D at 1. As part of its plan and consistent with then-existing N.J.A.C. 14:2.1-3.1, PSE&G proposed to set a standard price for which it would purchase the energy savings generated by customers or third parties that participated in the Standard Offer Program. *Id.* The payments made by PSE&G for measured and verified energy savings under the terms of the SESA were to be recovered by PSE&G in its retail rates. *See id.* at 5.

After discovery, public hearings and negotiations among interested parties, on December 15, 1992, the NJBPU issued an order approving PSE&G's DSM Resource Plan. *See id.* at 1-8. As part of this order, the NJBPU specifically approved the proposed form of the SESA, which set forth the terms under which PSE&G could contract with entities to provide energy-conservation services for energy and demand savings. *Id.* at 10.

On or about April 29, 1995, Vision Impact Corp. ("VIC"),[1] an energy services company, entered into the SESA with PSE&G as part of the Standard Offer Program. Compl. ¶ 2. Under the

---

[1] VIC and a separate entity called ME New Jersey Inc. were the two general partners of a third entity, MV Partners L.P. ("MVP") (collectively, with VIC, "VIC/MVP"). Compl. ¶ 25. MVP later entered into a loan agreement with an agent of Natixis, dated April 26, 2006. *Id.* MVP later defaulted on its loan payments to Natixis. *Id.* ¶ 26. The loan was accelerated on March 14, 2011,

**NOT FOR PUBLICATION**

SESA, VIC provided energy savings to PSE&G—through the design, purchase and installation of DSM equipment—and PSE&G was obligated to purchase these energy savings from VIC. *Id.* ¶¶ 1, 3. In order to produce energy savings for PSE&G under the SESA, VIC entered into numerous, separate third-party contracts with host facilities—businesses, hospitals, and governmental entities—in New Jersey that wanted VIC to design, purchase and install DSM equipment on their premises. *Id.* ¶¶ 30, 44, 54, 63, 72. Through methodology detailed in the SESA, PSE&G would compensate VIC for the energy savings resulting from VIC's improvements at the various facilities in accordance with a formula included in the SESA. *Id.* ¶ 4; Quraishi Cert., Ex. A at 14. Before PSE&G compensated VIC under the SESA, the energy savings had to be measured and verified. *Id.*

Once the energy savings equipment was installed on the hosts' premises, PSE&G began making payments to VIC for the energy savings that were generated from the installation of the energy savings equipment. Compl. ¶ 4. However, beginning in the third and fourth quarters of 2010, PSE&G refused to make further payments even though VIC contends that its DSM projects continued to operate at their host locations, and continued to produce energy savings that the SESA required PSE&G to purchase. *Id.* ¶ 5.

On Noevember 21, 2013, Natixis filed its complaint asserting three causes of action: (1) that PSE&G breached the SESA; (2) that PSE&G has waived VIC's strict adherence to the SESA's Management and Verification Plan; and (3) that PSE&G interfered with VIC's contracts with host facilities. *See id.* ¶¶ 83-108.

By letter dated January 24, 2014, PSE&G, invoking what it claims are its rights under Section 12.02 of the SESA, asked the NJBPU to resolve the issues of the accuracy and absence of

─────────────────

and, thereafter, Natixis succeeded to the rights of MVP and VIC as per the loan agreement, including any rights VIC/MVP had under the Standard Offer Program. *Id.*

NOT FOR PUBLICATION

VIC's data underlying the calculation of energy savings and VIC's failure to comply with the terms of the SESA. *See* Quraishi Cert., Ex. F. Specifically, PSE&G states that in October 2010 it performed maintenance audits at certain VIC sites, and that these audits raised significant issues with regard to the accuracy and absence of the data being submitted by VIC underlying the calculation of energy savings. *See id.*; Compl. ¶¶ 5, 8. PSE&G states in its letter that it conducted audits at additional sites in 2011 and obtained similar results. *See* Quraishi Cert., Ex. F; Compl. ¶¶ 38, 50, 58, 67, 78. PSE&G maintains that because the energy savings were not measurable and verifiable as to whether or how much energy savings had been realized, there was no basis for PSE&G to pay VIC for such savings under the SESA. *See* Quraishi Cert., Ex. F; Compl. ¶ 8.

This is not the first dispute between these parties regarding payments for energy savings under the SESA. On February 19, 1998, consistent with its rights under Section 12.02 of the SESA, VIC filed a petition with the NJBPU seeking an order directing, among other things, that PSE&G make certain payments VIC claimed were earned and due under the SESA. *See* Quraishi Cert., Ex. E at 1. The matter was referred to the Office of Administrative Law and assigned to an administrative law judge. *Id.* Following pre-hearing discovery, the parties reached an agreement to settle the outstanding issues, which the administrative law judge found acceptable, and which was confirmed and approved by the NJBPU by order dated August 4, 1999. *Id.* at 1-2.

## STANDARD OF REVIEW

PSE&G frames its motion as a motion to dismiss under either Federal Rule of Civil Procedure 12(b)(6) or 12(b)(1). However, the substance of the motion is actually a request to refer the matter to the NJBPU under the doctrine of primary jurisdiction. The motion does not go to the merits of the case or challenge the sufficiency of the pleadings. As such, the Court will construe

**NOT FOR PUBLICATION**

PSE&G's motion to dismiss as a request to refer the matter to the NJBPU under the doctrine of primary jurisdiction.

> The doctrine of primary jurisdiction:
>
> applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.

*United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 64 (1956). *See also Reiter v. Cooper*, 507 U.S. 258, 268 (1993) (doctrine applies "to claims properly cognizable in court that contain some issue within the special competence of an administrative agency"). The Third Circuit has held that the doctrine applies when decisionmaking is:

> divided between courts and administrative agencies [and] calls for judicial abstention in cases where protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme. . . . It is now generally accepted . . . that the principal justification [for the doctrine] is the need for an orderly and sensible coordination of the work of agencies and courts.

*Cheyney State Coll. Faculty v. Hufstedler*, 703 F.2d 732, 736 (3d Cir. 1983) (internal citation omitted).

"No fixed formula exists for applying the doctrine of primary jurisdiction," so matters should be evaluated on a case by case basis. *W. Pac. R.R. Co.*, 352 U.S. at 59. The Third Circuit has found the following four factors helpful in determining whether to apply the doctrine:

> (1) Whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise; (2) Whether the question at issue is particularly within the agency's discretion; (3) Whether there exists a substantial danger of inconsistent rulings; and (4) Whether a prior application to the agency has been made.

*Baykeeper v. NL Indus., Inc.*, 660 F.3d 686, 691 (3d Cir. 2011).

**NOT FOR PUBLICATION**

## DISCUSSION

Because weighing the Third Circuit's four *Baykeeper* factors indicates that referral to the NJBPU is appropriate, PSE&G's request is granted.

**I.      First *Baykeeper* factor: Whether the question at issue involves technical or policy considerations within the agency's particular field of expertise**

PSE&G argues that referral to an administrative agency for resolution is appropriate if "the matter involves technical or policy considerations which are beyond the court's ordinary competence and within the agency's field of expertise." *Oh v. AT&T Corp.*, 76 F. Supp. 2d 551, 557 (D.N.J. 1999) (quoting *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 496 F.2d 214, 220 (3d Cir. 1974)). PSE&G asserts that the NJBPU's expertise with the nuances and policies of the DSM Standard Offer Program, the SESA, and the Measurement Protocol and site-specific Measurement and Verification Plans weighs in favor of a finding that the issues here involve both technical and policy considerations within the NJBPU's particular field of expertise. Def.'s Br. in Support of Mot. to Dismiss at 14 (ECF No. 10-1).

PSE&G supports this argument by stating that the NJBPU has the expertise and unique insight into the policy considerations behind the DSM Standard Offer Program, as well as the goals of that program and the methods by which those goals are to be met. *Id.* PSE&G contends that Natixis' complaint challenges PSE&G's actions in administering and implementing its DSM Standard Offer Program—a program that was conceived, developed, approved, and implemented under the authority of the NJBPU. *Id.* PSE&G points out that the rules and regulations regarding the structure and operation of the DSM Standard Offer Program were the subject of an extensive rulemaking process by the NJBPU, as well as extensive negotiations between the Board and various interested parties, and that the very terms within the SESA that Natixis now claims PSE&G breached were approved by the NJBPU in the course of the DSM Program rulemaking. *Id.* As a

**NOT FOR PUBLICATION**

result, PSE&G argues, Natixis' claims turn on the interpretation of the SESA, an area clearly within the NJBPU's expertise. *Id.*

PSE&G further argues that the issues raised by Natixis involve technical considerations within the NJBPU's expertise. As example, under the SESA, VIC was required to calculate energy savings in a manner consistent with the NJBPU approved Measurement and Verification Protocol and site-specific Measurement and Verification Plans. *Id.* at 15. According to PSE&G, the application of the methodologies employed to determine energy savings is unique to DSM and is technically complex, as energy savings are typically determined utilizing engineering principles found in the Measurement Protocol, particulars of the energy savings equipment, and monthly electronic data. *Id.* PSE&G asserts that because the NJBPU promulgated the regulations governing DSM, Measurement Protocol, and the calculations of energy savings in the SESA, the NJBPU has unique expertise over the technical issues raised by Natixis' action. *Id.*

Natixis disagrees. Natixis argues that none of its claims require the interpretation of statutes or regulations falling with the unique purview of the NJBPU. To the contrary, it asserts, its breach of contract claim simply alleges that it has provided energy savings to PSE&G, which PSE&G was required to pay for under the SESA. According to Natixis, the claims in its complaint involve typical questions of contract law and interpretation that courts routinely resolve, and are not within any unique purview of the NJBPU. Pl.'s Opp'n to Mot. to Dismiss at 24 (ECF No. 14).

To support its argument, Natixis points to the Second Circuit's decision in *Fulton CoGeneration Assoc. v. Niagra Mohowk Power Corp.*, 84 F.3d 91 (2d Cir. 1996). *Fulton* involved a dispute between Niagara Mohawk Power Corporation, an electric utility regulated by the New York Public Service Commission ("PSC")—New York's analogue to the NJBPU—and Fulton CoGeneration Associates, an independent power producer. *Fulton*, 84 F.3d at 94-95. Fulton and

**NOT FOR PUBLICATION**

Niagara entered into a contract whereby Fulton "agreed to deliver and Niagara agreed to accept all of the electricity produced" by a power plant operated by Fulton. *Id.* The Fulton/Niagara agreement also required Niagara to "pay for the electricity on the basis of energy, or kwh delivered" to Niagara at the rate established in Niagara's tariff. *Id.* The New York PSC approved the contract between Fulton and Niagara. *Id.* In July 1991, Fulton began to deliver electricity to Niagara and, for a period of time, Niagara paid for that electricity. *Id.* Niagara later unilaterally changed the formula for calculating its payments to Fulton, arguing that it had determined that Fulton's power plant was producing electricity above the 47 megawatt capacity called for in the contract. *Id.* Niagara then began to pay Fulton based upon its new formula. *Id.* Fulton brought a breach of contract claim against Niagara for the difference in its compensation, and Niagara moved to dismiss on primary jurisdiction grounds. *Id.* at 96.

The Second Circuit agreed with the district court in rejecting Niagara's primary jurisdiction argument, in part because "the issues of contract interpretation here are neither beyond the conventional expertise of judges nor within the special competence of the PSC . . . ." Natixis argues that because the facts in the present case are so similar to those of *Fulton*, PSE&G's request to refer this case to the NJBPU must be denied.

Natixis also asserts that PSE&G "makes much ado" of the Measurement and Verification Plan that the Standard Offer Program contemplated for measurement of the energy savings produced by each project, but that PSE&G fails to address the factual background of Natixis' assertion that PSE&G has not strictly adhered to the Measurement and Verification Plan requirements for the VIC projects in the past (or to the Measurement and Verification Plan requirements for other projects completed by third parties under the Standard Offer Program). Pl.'s Opp'n to Mot. to Dismiss at 26. Natixis states that PSE&G is also silent regarding Natixis'

**NOT FOR PUBLICATION**

assertion that PSE&G "has waived strict adherence to the M&V Plan requirements embodied in the SESA, and/or is estopped from enforcing them based upon PSE&G's prior course of conduct." *Id.* at 25-26. According to Natixis, it is apparent that if PSE&G waived (or is estopped from refusing to accept) energy savings measurement data that does not strictly comply with the Measurement and Verification Plan, any purported technical or policy expertise that the NJBPU has in this area would be entirely irrelevant to resolving this dispute. Natixis asserts that PSE&G would simply be obligated to accept Natixis' energy savings data, under the principles of contract law, and pay Natixis for the energy savings represented by that data, as it had in the past. *Id.* at 26.

The Court finds that this factor weighs strongly in favor of referral of this matter to the NJBPU. The Court agrees with PSE&G that the NJBPU has the expertise and unique insight into the policy considerations behind the DSM Standard Offer Program. Natixis' complaint challenges PSE&G's actions in administering and implementing its DSM Standard Offer Program, which was developed and implemented under the authority of the NJBPU. The rules and regulations regarding the structure and operation of the DSM Standard Offer Program were the subject of an extensive rule-making process by the NJBPU, as well as extensive negotiations between the Board and various interested parties, and the terms within the SESA that Natixis now claims PSE&G breached were approved by the NJBPU in the course of the DSM Program rule making. As a result, Natixis' claims turn on the interpretation of the SESA, an area clearly within the NJBPU's expertise.

The issues raised by Natixis also involve technical considerations within the NJBPU's expertise. Under the SESA, VIC was required to calculate energy savings in a manner consistent with the NJBPU-approved Measurement and Verifcation Protocol and site-specific Measurement and Verification Plans. The application of the methodologies employed to determine energy

**NOT FOR PUBLICATION**

savings is technically complex. The NJBPU promulgated the regulations governing DSM, Measurement Protocol, and the calculations of energy savings in the SESA, and it follows that the NJBPU has unique expertise over the technical issues raised by Natixis' action. *See Oh*, 76 F. Supp. 2d at 557 (referral to an administrative agency for resolution is appropriate if "the matter involves technical or policy considerations which are beyond the court's ordinary competence and within the agency's field of expertise") (quoting *MCI Commc'ns Corp.*, 496 F.2d at 220. In particular, this case requires determination of whether certain energy savings equipment was working properly, was being operated correctly, and/or was producing good data. Such determinations are particularly suited to the NJBPU's expertise.

There is also a rate aspect to the dispute over energy savings under the SESA. PSE&G has a right to recover the costs of making the energy savings payments under the SESA through rate applications, but only if the payments are in compliance with the terms of the Standard Offer Program. To obtain this rate relief, PSE&G must obtain NJBPU approval. Because the customers are ultimately responsible for any costs for energy savings under the SESA, this is not simply a contract dispute between private parties and special care and policy considerations must be taken by the NJBPU in resolving these issues. *See* Quraishi Cert., Ex. D at 5-9.

This Court does not find persuasive Natixis' argument that this case involves only typical questions of contract law and interpretation that are not within the unique purview of the NJBPU. Unlike the Second Circuit's decision in *Fulton*, where the only issue was one of interpretation of a purely contractual term, this case implicates complex technical issues and calculations that are not within the conventional experience of judges.

NOT FOR PUBLICATION

## II.   Second *Baykeeper* factor: Whether the question at issue is particularly within the agency's discretion

PSE&G also argues that the second *Baykeeper* factor weighs in favor of referring this matter to the NJBPU. PSE&G asserts that because the NJBPU adopted the rules and regulations which govern the DSM Program and the SESA, the interpretation of the provisions of the SESA under the goals and policies of the DSM Program is clearly within the NJBPU's discretion. PSE&G also contends that Section 12.02 of the SESA, which entitles the non-defaulting party to bring a dispute arising under the SESA before the NJBPU, demonstrates the NJBPU's retention of discretion over the interpretation of the SESA, the rights and obligations of the parties under the SESA, and the policies behind the DSM Program. Def.'s Br. in Support of Mot. to Dismiss at 15-16.

Natixis, on the other hand, argues that this second factor weighs in favor of keeping this matter in front of this Court. Natixis supports this argument by pointing out that the NJBPU lacks the jurisdiction to consider all of Natixis' claims in the first instance—specifically, because the NJBPU lacks authority to award damages on any cause of action asserted by Natixis, and it is also barred from hearing Natixis' tort claim as a matter of law. *See, e.g.*, *Cameron v. Verizon N.J. Inc.*, BPU Docket No. TC10060396U, Final Order (dated April 12, 2012) ("[T]he [NJBPU] has taken the long-standing position that it lacks the authority to award money damages."); *Muise v. GPU, Inc.*, 753 A.2d 116, 127-28 (N.J. Super. App. Div. 2000) (the NJBPU "lacked statutory authority to decide common law tort actions in any respect . . . . The question of [a] utility's duty should be resolved by the common law and a jury, rather than by the [New Jersey Administrative Code's] standards for providing and restoring service and the coordinate tariff provisions.").

Natixis also asserts that the Standard Offer Program has been discontinued by the NJBPU. By notice published in the *New Jersey Register* on July 16, 2007, the NJBPU suspended its

**NOT FOR PUBLICATION**

regulations on the Standard Offer Program, and Natixis contends that today, the only regulations that the NJBPU keeps in force regarding the Standard Offer Program refer to the length of time existing Standard Offer contracts may remain in force. *See* N.J.A.C. 14:8-8.1–8.3. Natixis argues that the issues presented by its complaint do not implicate these rules, and that it is undisputed that each of the projects entered into between PSE&G and Natixis has run for its full term. Compl. ¶¶ 34-35, 47, 57, 66, 76-77. Natixis contends that based on this record, it is plain that the NJBPU has not maintained exclusive jurisdiction over the SESA, and that this fact, along with the NJBPU's inability to award damages or consider tort claims, confirms that the second *Baykeeper* factor supports that this case remain before this Court.

  The Court finds that this factor also weighs in favor of referral for many of the same reasons given as to the first factor. The interpretation of the provisions of the SESA under the goals and policies of the DSM Standard Offer Program is clearly within the NJBPU's discretion. This Court is not persuaded by Natixis' argument that the issues raised in its complaint do not fall within the NJBPU's discretion because the Standard Offer Program has been discontinued and the regulations repealed. Though it repealed its regulations, the NJBPU continues to maintain regulations for the Standard Offer contracts codified at N.J.A.C. 14:8-8, *et seq.*, which do not expire until May 1, 2019. *See* New Jersey Register, 43 N.J. Reg. 1162(a) (May 2, 2011). The NJBPU clearly has continued authority and discretion over the DSM Program and the SESA, and it clearly has expansive jurisdiction and regulatory power over utilities. *See, e.g.*, *Matter of Valley Road Sewerage Co.*, 154 N.J. 224, 235 (1998) ("The New Jersey Legislature has vested the BPU with general supervision and regulation of and jurisdiction and control over all public utilities . . . and their property, property rights, equipment, facilities and franchises so far as may be necessary for

NOT FOR PUBLICATION

the purpose of carrying out the provisions of Title 48 of the New Jersey Statutes.") (internal citation omitted).

Nor is the Court persuaded by Natixis' argument that the fact that the NJBPU lacks authority to award damages and is barred from hearing Natixis' tort claim weighs against referral to the NJBPU. Rather, referral requires this Court to either dismiss without prejudice or stay this case pending resolution before the NJBPU. *See Reiter v. Cooper*, 507 U.S. 258, 268-69 (1993). Once the NJBPU has made its initial determination, Natixis may return to this Court for adjudication of any remaining issues.[2]

### III.    Third *Baykeeper* factor: Whether there exists a substantial danger of inconsistent rulings

PSE&G contends that the third *Baykeeper* factor weighs in favor of referral of this case to the NJBPU because in February 1998, VIC filed a petition with the NJBPU regarding alleged payments due from PSE&G under the SESA. *See* Quraishi Cert., Ex. E at 1, 7. The NJBPU then transferred the petition to the Office of Administrative Law. PSE&G and VIC resolved the dispute prior to a hearing, and entered into a settlement agreement which was approved both by the Administrative Law Judge and the NJBPU. Specifically, on July 28, 1999, the NJBPU entered an order adopting the Administrative Law Judge's decision and the settlement, finding that the terms of the settlement agreement were "reasonable" and "in the public interest." *Id.* at 2. PSE&G therefore contends that the NJBPU has previously addressed and approved a similar issue regarding the exact same SESA and involving the very same parties, that PSE&G has performed under the SESA consistent with the resolution of the 1998 dispute, and that dismissal and referral

---

[2] For those same reasons, referral to the NJBPU will not deprive Natixis of a jury trial for those issues not within the NJBPU's primary jurisdiction.

13

**NOT FOR PUBLICATION**

to the NJBPU will avoid the potential for inconsistent interpretations of the DSM Program and the SESA. Def.'s Br. in Support of Mot. to Dismiss at 16.

PSE&G further asserts that the NJBPU has adjudicated other disputes regarding PSE&G's Standard Offer Programs and the terms of other standard energy savings agreements. As example, in 2009, the NJBPU adjudicated and entered an order in a dispute regarding a Standard Energy Saving Agreement entered into between PSE&G and the Passaic Valley Sewerage Commissioners ("PVSC"). *See* Quraishi Cert., Ex. G at 1. The issues before the NJBPU were whether PVSC's proposed revised Measurement and Verification Protocol conformed to the NJBPU approved methods and whether a baseline for calculating savings could be established. *Id.* at 2. According to PSE&G, this order provides another example of an adjudication by the NJBPU that is analogous to the issue before this Court and demonstrates the potential for substantial danger of inconsistent rulings between the district court and the NJBPU.

Finally, PSE&G points out that it has submitted a letter petition to the NJBPU regarding the same issue that is presently before this Court. *See* Quraishi Cert., Ex. F. That letter petition requests resolution pursuant to PSE&G's rights under Section 12.02 of the SESA. It follows that, according to PSE&G, with the present matter before both the NJBPU and this Court, there exists the substantial danger of concurrent inconsistent rulings.

Natixis answers that there is no danger of inconsistent rulings if this Court resolves this dispute. Natixis says that it is not possible for there to be a danger of inconsistent rulings "especially given the fact that all of the Projects terminated before Natixis filed this lawsuit." Pl.'s Opp'n to Mot. to Dismiss at 29. According to Natixis, since all of Natixis' projects under the SESA have terminated, all that remains is the determination of the extent of PSE&G's liability for refusing to pay for the energy savings that these projects generated. *Id.* Natixis contends that there

**NOT FOR PUBLICATION**

is no possibility for this Court's ruling on that issue to be in any way inconsistent with the settlement the parties voluntarily made in 1999 (the "1999 Settlement"), because the 1999 Settlement resolved wholly separate issues from those raised by Natixis in this case, and it expressly did not affect the parties' future rights against each other. *Id.* at 29-30.

As to PSE&G's argument about the adjudication by the NJBPU between PSE&G and the PVSC regarding an agreement those parties entered into under the Standard Offer 2 Program, Natixis claims that PSE&G fails to explain how this Court's adjudication of the present case (which involves DSM projects entered into under PSE&G's Standard Offer 1 program) could cause inconsistency with the NJBPU's ruling under the Standard Offer 2 program. According to Natixis, the ruling in the PVSC case involved "unique" and "specific circumstances" related to that particular PVSC project and that there is nothing from the face of that ruling that implicates the specific issues Natixis brought before this Court.

Finally, Natixis observes that PSE&G filed its letter petition with the NJBPU on January 27, 2014—two months after PSE&G was served with process in this case, and on the same day that it filed the present motion. By letter dated February 14, 2014, Natixis informed the NJBPU that the parties are currently enmeshed in litigation, and asked the NJBPU not to take any action on PSE&G's letter request until this Court decides whether it will retain jurisdiction over this matter. As a result, Natixis claims that contrary to PSE&G's claims, there does not exist a "substantial danger" of "concurrent inconsistent rulings." In fact, Natixis argues, the only danger of inconsistent rulings would come from this Court deferring to the NJBPU because Natixis' claims for damages and its tort claim would have to be litigated here, which would force the parties to litigate in two separate fora, engage in duplicative discovery, and risk contradictory rulings by this Court and the NJBPU.

15

**NOT FOR PUBLICATION**

The Court finds that this factor does not weigh heavily one way or the other. It is unclear how much of a danger of inconsistent rulings there is given that the DSM Standard Offer Program has been terminated (although many of the DSM contracts are still in effect through May 1, 2019). It is also unclear how similar the issues covered in the 1999 Settlement are to the issues presented in this case, and what the actual danger is of an inconsistent ruling with that settlement agreement. Nor has the Court been presented with enough information to know whether there is truly any danger of an inconsistent ruling with the NJBPU's adjudication of the dispute between PSE&G and the PVSC, or even if any potential inconsistency would be problematic. And it is impossible for this Court to know whether the NJBPU will take action on PSE&G's January 27, 2014 letter petition regardless of whether this Court decides to refer the matter.

## IV.    Fourth *Baykeeper* factor: Whether a prior application to the agency has been made

Finally, PSE&G argues that the fourth *Baykeeper* factor supports referring this case to the NJBPU because VIC, Natixis' predecessor-in-interest, filed a petition with the NJBPU in February of 1998 regarding an issue similar to the one Natixis now brings before this Court. PSE&G also again points out that it filed a letter petition with the NJBPU on January 27, 2014. Natixis responds by re-asserting that the application VIC made to the NJBPU in 1998 did not concern the disputes at issue here, or the legal questions raised by Natixis in its complaint, and by pointing out that PSE&G's January 27, 2014 letter petition was filed after this suit commenced, and therefore cannot be considered a *prior* application.

This Court finds that the fourth factor weighs toward referral to the NJBPU. VIC made a previous application to the NJBPU under this SESA in 1998, which weighs in favor of referral. But the Court does not accept PSE&G's argument that its letter petition filed with the NJBPU in

**NOT FOR PUBLICATION**

January 2014 counts as a "prior application" to the NJBPU, since it was most certainly filed after this suit was filed in federal court.

> **V.     This matter is referred to the NJBPU**

Given that three of the four *Baykeeper* factors weigh in favor of referral (while the fourth does not weigh strongly one way or the other), this Court concludes that referral of this case to the NJBPU is appropriate. Because of potential prejudice to Natixis, stay of this action pending the NJBPU's determination of liability is a more appropriate course of action than outright dismissal. *See, e.g.*, *Laveson v. Trans World Airlines*, 471 F.2d 76, 84 (3d Cir. 1972); *MCI Communications Corp.*, 496 F.2d at 224; *Oh*, 76 F. Supp. 2d at 557-58. Accordingly, this Court refers this matter to the NJBPU for a determination of PSE&G's liability and all other matters within its jurisdiction. The action will be stayed until the NJBPU issues its decision. Either party may petition to reactivate the case, if appropriate, after the NJBPU has resolved the issues within its jurisdiction.

**CONCLUSION**

PSE&G's request to refer this matter to the NJBPU is granted. An appropriate order follows.

Date: April 29, 2014

/s/ William H. Walls
United States Senior District Judge

17